IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,    )
                            )
        Plaintiff        )
                            )
      v.            )    CIVIL ACTION
                            )    NO.
BOSTON SAND AND GRAVEL    )
COMPANY; OSSIPEE AGGREGATES )
CORPORATION; and        )
SOUTHEASTERN CONCRETE, INC.,  )
                            )
      Defendants.      )

02-10999 JLT

## COMPLAINT

Plaintiff, the United States of America, through its undersigned attorneys, and at the request of the Administrator of the United States Environmental Protection Agency (EPA), alleges as follows:

## INTRODUCTION

1.    This is a civil action brought against the Boston Sand & Gravel Company ("BS&G"), and two of its wholly-owned subsidiaries, Ossipee Aggregates Corporation ("Ossipee"), and Southeastern Concrete, Inc. ("Southeastern"), pursuant to sections 309(b), 309(d) and 311(b)(7)(C) of the Clean Water Act (CWA), 33 U.S.C. §§ 1319(b), 1319(d) and 1321(b)(7)(C).

2.    The claims arise from the failure of BS&G, Ossipee, and Southeastern to comply with the CWA in the operation of four facilities in Massachusetts where concrete

products are manufactured and where aggregate storage and distribution activities are conducted.

3.     This Court has jurisdiction over the subject matter of this action pursuant to sections 309(b),  311(b)(7)(E), and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E), and 1321(n), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

4.     Venue is proper in this district pursuant to sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E), and pursuant to 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1395.

5.     Notice of the commencement of this action has been given to the Commonwealth of Massachusetts pursuant to section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANTS

6.     BS&G is a domestic for-profit corporation incorporated under the laws of the Commonwealth of Massachusetts.

7.     Ossipee is a domestic for-profit corporation incorporated under the laws of the Commonwealth of Massachusetts.  Ossipee is a wholly-owned subsidiary of BS&G.

8.     Southeastern is a domestic for-profit corporation incorporated under the laws of the Commonwealth of Massachusetts.  Southeastern is a wholly-owned subsidiary of BS&G.

9.     BS&G, Ossipee, and Southeastern each owns and operates one or more facilities where concrete products, including ready-mix concrete and flowable fill, are

manufactured, and/or where processing and aggregate storage and distribution activities are conducted.

10.     BS&G, Ossipee, and Southeastern each is a person within the meaning of section 502(5) of the CWA, 33 U.S.C. § 1362(5).

### Count 1
### Unauthorized Discharges of Process
### Water At the Millers River Facility

11.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 10 above as though fully set forth herein.

12.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters of the United States except in compliance with the terms and conditions of a National Pollution Discharge Elimination System (NPDES) permit issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342.

13.     BS&G operates a ready-mix concrete manufacturing facility located at 500 Front Street, Charlestown, Massachusetts, adjacent to the Millers River (the Millers River Facility).

14.     At all times relevant to this complaint, BS&G operations at the Millers River Facility have included various outdoor activities which generate pollutants, including washing off the exterior of concrete mixer trucks and other vehicles; washing out the interior of concrete mixer trucks and other vehicles; and operating a wastewater treatment system with lagoons.

- 3 -

15.    From at least March 11, 1996, until March 25, 1996, BS&G discharged extremely high pH process wastewater down an eroded channel in the bank of the Millers River to the Millers River.

16.    From at least May 15, 1995, until June 10, 1996, and again on at least September 11, 1996, BS&G discharged extremely high pH process wastewater from truck wash off operations to catch basins located on the access road to the facility and through storm drains to the Millers River.

17.    BS&G did not have a permit authorizing these discharges.

18.    The process waste waters BS&G discharged from the Millers River Facility contained "pollutants" within the meaning of section 502(6) of the CWA, 33 U.S.C. § 1362(6).

19.    The storm drains, eroded channel, and lagoons are "point sources" within the meaning of section 502(14) of the CWA, 33 U.S.C. § 1362(14).

20.    The Millers River is a navigable water of the United States within the meaning of section 503(7), 33 U.S.C. § 1362(7).

21.    By discharging process waste waters from the Millers River Facility to the Millers River without a permit, BS&G violated section 301(a) of the CWA, 33 U.S.C. § 1311(a).

22.    Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

## Count 2
## NPDES Permit Effluent Limit Violations At the Millers River Facility

23.    The United States realleges and incorporates by reference the allegations of

paragraphs 1 through 22 above as though fully set forth herein.

24.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of

pollutants into navigable waters of the United States except in compliance with the terms

and conditions of an NPDES permit issued pursuant to section 402 of the CWA, 33

U.S.C. § 1342.  Section 402 of the Act, 33 U.S.C. § 1342, provides that the Administrator

of EPA may issue permits under the NPDES program for the discharge of any pollutant

into the navigable waters of the United States upon such specific terms and conditions as

the Administrator may prescribe.

25.    Pursuant to section 402 of the Act, 33 U.S.C. § 1342, NPDES Permit No.

MA0000531 was issued to BS&G for discharges from the Millers River facility from a

single outfall to the Millers River subject to certain specific effluent limitations,

monitoring requirements, and quarterly reporting requirements.

26.    At all times material to this complaint, BS&G's NPDES permit has

contained  effluent limits, monitoring requirements, and quarterly reporting requirements

for pH, total suspended solids and sulfate.

27.     During the third quarter 2000, fourth quarter 2000, and the first quarter of 2001, specifically in September 2000, October 2000, November 2000, and February 2001, when BS&G discharged process wastewater pursuant to its NPDES permit, BS&G's discharge exceeded the discharge limitation for pH range, in violation of the requirements of its NPDES permit.

28.     During at least the fourth quarter of 2000, and the first and second quarters of 2001, and specifically on December 14, 2000, December 26, 2000, January 24, 2001, March 27, 2001, and June 28, 2001, BS&G discharged process wastewater which exceeded the daily maximum discharge limitation in BS&G's NPDES permit for total suspended solids, in violation of the requirements of its NPDES permit.

29.     During at least the fourth quarter 2000, and the first quarter of 2001, and specifically in December 2000, and January 2001, BS&G discharged process wastewater which exceeded the daily average discharge limitation in BS&G's NPDES permit for sulfate, in violation of the requirements of its NPDES permit.

30.     By discharging process waste waters from Millers River Facility to the Millers River in violation of its NPDES permit, BS&G violated section 301(a) of the CWA, 33 U.S.C. § 1311(a).

31.     Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is liable for a civil penalty of up to $27,500 per day for each such violation.

**Count 3**

## NPDES Permit Sampling, Monitoring and
## Reporting Violations At the Millers River Facility

32.    The United States realleges and incorporates by reference the allegations of paragraphs 1 through 33 above as though fully set forth herein.

33.    At all times material to this complaint, BS&G's NPDES permit for the Millers River Facility has required BS&G to conduct quarterly monitoring and reporting to EPA concerning BS&G's discharges, in accordance with specified requirements.

34.    At various times from the fourth quarter of 1996 through the first quarter of 2000, BS&G failed to comply with the monitoring and reporting requirements of its NPDES permit by:

   a.    failing to monitor and report data for flow, total suspended solids, and sulfate; and

   b.    failing to monitor and report the actual range of the pH in grab samples taken at the point of discharge to the Millers River.

35.    During the third quarter of 2000, BS&G failed to monitor and report data for turbidity in violation of the requirements of its NPDES permit.

36.    During the fourth quarter of 2000, BS&G failed to monitor and report data for flow in violation of the requirements of its NPDES permit.

37.    By failing to monitor and report its discharges in accordance with the terms of its NPDES permit, BS&G violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

38.    Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

## Count 4
## Failure to Apply for NPDES Storm Water Permit – Miller River Facility

39.    The United States realleges and incorporates by reference the allegations of paragraphs 1 through 40 above as though fully set forth herein.

40.    Section 308(a) of the CWA, 33 U.S.C. § 1318(a) authorizes the Administrator of EPA to require the owner or operator of any point source to provide such information as the Administrator may reasonably need to carry out the objectives of the CWA, including, among other things, the development and issuance of NPDES permits under section 402 of the CWA, 33 U.S.C. § 1342.

41.    Under sections 308 and 402 of the CWA, 33 U.S.C. §§ 1318 and 1342, the Administrator on November 16, 1990, promulgated regulations relating to the control of storm water discharges, at 40 C.F.R. § 122.26.

42.    Section 122.26(c)(1), 40 C.F.R., provides that dischargers of storm water associated with industrial activity are required to apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit. Pursuant to 40 C.F.R. § 122.26(e), the deadline for individual and group permit applications was

October 1, 1992.  Pursuant to the NPDES Baseline General Permit available for

dischargers of storm water associated with industrial activity located in Massachusetts

(hereinafter the Baseline General Permit), dischargers seeking coverage under the

Baseline General Permit were required to file a Notice of Intent (NOI) to be covered by

October 1, 1992.  57 Fed. Reg. 44438 (September 25, 1992).

43.    Effective September 29, 1995, EPA issued a final NPDES Storm Water

Multi-Sector General Permit for Industrial Activities (60 Fed. Reg. 50804) (the 1995

Multi-Sector Permit), available for certain facilities, including cement and concrete

product manufacturing facilities (Section E).  To be covered under the 1995 Multi-Sector

Permit, a facility discharging storm water associated with industrial activity was required

to submit a NOI by March 29, 1996.  61 Fed. Reg. 5254 (February 9, 1996).  For a

facility previously covered by the Baseline General Permit, a NOI had to be submitted

prior to the expiration of the Baseline General Permit, or by September 25, 1997.

44.    Under 40 C.F.R. § 122.26(b)(14)(ii), storm water associated with industrial

activity includes storm water discharges associated with industrial activity from  facilities

identified under Standard Industrial Classification (SIC) Major Group 32 (except 323).

45.    BS&G's Millers River Facility conducts activities associated with

manufacturing concrete products and mineral mining and processing and is identified

under SIC Major Group 32 (other than SIC code 323) within the meaning of 40 C.F.R.

§ 122.26(b)(14)(ii).

46.     Since at least October 1, 1992, BS&G has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Millers River Facility to the Millers River.   Storm water from the Millers River Facility discharges to the Millers River through storm drains and eroded channels on the banks of the Millers River.

47.     The storm drains and eroded channels are all "point sources" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. §1362(14).

48.     BS&G did not apply for an individual or group permit, or submit a NOI for coverage under the 1995 Multi-Sector Permit, for discharges of storm water from the Millers River Facility until June 7, 1996, and did not receive permit coverage under the 1995 Multi-Sector Permit until June 9, 1996.

49.     By failing to apply for a permit at the Millers River Facility, BS&G violated section 308(a) of the CWA, 33 U.S.C. § 1318(a).   Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), BS&G is liable for a civil penalty of up to $25,000 per day of such violation.

## Count 5
## Failure to Apply for NPDES Storm Water Permit – South Boston Facility

50.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 51 above as though fully set forth herein.

51.     BS&G operates a facility at 600 Summer Street, Building #16, 25 FID Kennedy Avenue, South Boston, Massachusetts (the South Boston Facility).   The South

Boston Facility conducts activities associated with manufacturing concrete products and is identified under SIC code 32 (other than SIC Code 323) within the meaning of 40 C.F.R. § 122.26(b)(14)(ii).

52.     Since at least May 6, 1996, when BS&G began operations at the South Boston Ready Mix Concrete facility, BS&G has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the facility through storm drains and outfalls to Boston Harbor.

53.     The storm drains and outfalls  are "point sources" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

54.     The Boston Harbor is a "water of the United States" within the meaning of section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

55.     BS&G failed to apply for permit coverage for storm water discharges from the South Boston Facility to the Boston Harbor from May 1996 until January 29, 2001.

56.     By failing to apply for a permit at the South Boston Facility, BS&G violated section 308(a) of the CWA, 33 U.S.C. § 1318(a).  Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

### Count 6
### Failure to Apply for NPDES Storm Water Permit – Everett Facility

57.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 58 above as though fully set forth herein.

58.     Ossipee owns and operates a facility known as Ossipee Aggregates, at 201 Rover Street, Everett, Massachusetts (the Everett Facility).   The Everett Facility conducts activities associated with manufacturing concrete products and is identified under SIC Major Group 32 (other than SIC Code 323) within the meaning of 40 C.F.R. § 122.26(b)(14)(ii).

59.     Since at least October 1, 1992, Ossipee has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26, from the Everett Facility to the Island End River and the Mystic River through storm drains and outfalls.

60.     The  storm drains and outfalls are all "point sources" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

61.     The Island End River and the Mystic River are each "waters of the United States" within the meaning of section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

62.     Ossipee submitted a deficient NOI for a Baseline General Permit for the Everett Facility on or before October 1, 1992.  To the extent Ossipee qualified for coverage under the Baseline General Permit for the Everett Facility, that permit by its terms expired on September 25, 1997.  Ossipee thereafter failed to apply for a new permit or submit a NOI for coverage under the 1995 Multi-Sector Permit until at least May 26,

2000, when Ossipee submitted a NOI for permit coverage under the 1995 Multi-Sector Permit.

63.     By failing to apply for a permit for the Everett Facility, Ossipee violated section 308(a) of the CWA, 33 U.S.C. § 1318(a).  Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Ossipee is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

## Count 7
## Failure to Apply for NPDES Storm Water Permit – Weymouth Facility

64.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 65 above as though fully set forth herein.

65.     Since at least October 1, 1992, Southeastern has owned and operated a facility located at 667 Pleasant Street, Weymouth, Massachusetts, known as Southeastern Concrete (formerly known as Weymouth Concrete) (hereinafter the Weymouth Facility). The Weymouth Facility conducts activities associated with manufacturing concrete products and is identified under SIC Code 32 (other than SIC Code 323) within the meaning of 40 C.F.R. § 122.26(b)(14)(ii).

66.     Since at least October 1, 1992, Southeastern has periodically discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R.

§ 122.26 from the Weymouth Facility through storm drains and outfalls to tributaries of

the Old Swamp River.

67.    The storm drains and outfalls are "point sources" within the meaning of

section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

68.    The Old Swamp River and its tributaries are "waters of the United States"

within the meaning of section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

69.    Southeastern failed to apply for permit coverage for storm water discharges

from the Weymouth Facility to the tributaries of the Old Swamp River from October 1,

1992, until January 29, 2001.

70.    By failing to apply for a permit at the Weymouth Facility, Southeastern

violated section 308(a) of the CWA, 33 U.S.C. § 1318(a).  Pursuant to sections 309(b)

and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement

Act of 1996, 31 U.S.C. § 3701, Southeastern is liable for a civil penalty of up to $25,000

per day for each violation occurring prior to January 30, 1997, and $27,500 per day for

each violation occurring on January 30, 1997, or thereafter.

### Count 8
### Unauthorized Discharges of Storm Water
### – Millers River, South Boston, Everett, and Weymouth Facilities

71.    The United States realleges and incorporates by reference the allegations of

paragraphs 1 through 72 above as though fully set forth herein.

72.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a),  prohibits the discharge of

pollutants by any person into the navigable waters of the United States except in

compliance with, among other things, a NPDES permit issued under section 402 of the

CWA, 33 U.S.C. § 1342.

73.     From at least October 1, 1992, through June 9, 1996,  BS&G periodically

discharged "storm water associated with industrial activity" into waters of the United

States from the Millers River Facility without a permit.

74.     From May 6, 1996, through January 31, 2001,  BS&G periodically

discharged "storm water associated with industrial activity" into waters of the United

States from its South Boston Facility without a permit.

75.     By discharging storm water associated with industrial activity from the

Millers River and South Boston Facilities without a permit, BS&G violated section

301(a) of the CWA, 33 U.S.C. § 1311(a).

76.     From September 25, 1997, through at least May 26, 2000, Ossipee

periodically discharged "storm water associated with industrial activity" into waters of

the United States from the Everett Facility without a permit.

77.     By discharging storm water associated with industrial activity from the

Everett Facility without a permit, Ossipee violated section 301(a) of the CWA, 33 U.S.C.

§ 1311(a).

78.     From October 1, 1992, through January 31, 2001, Southeastern periodically

discharged "storm water associated with industrial activity" into waters of the United

States from its Weymouth Facility without a permit.

79.     By discharging storm water associated with industrial activity from the
Weymouth Facility without a permit, Southeastern violated section 301(a) of the CWA,
33 U.S.C. § 1311(a).

80.     The discharges of storm water associated with industrial activity from
BS&G's Millers River and South Boston Facilities, from Ossipee's Everett Facility, and
from Southeastern's Weymouth Facility are discharges of pollutants within the meaning
of section 502(12) of the Clean Water Act, 33 U.S.C.
§ 1362(12).

81.     Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b)
and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G,
Ossipee, and Southeastern is each liable for a civil penalty of up to $25,000 per day for
each violation occurring at its respective facility(ies) prior to January 30, 1997, and
$27,500 per day for each violation occurring on January 30, 1997, or thereafter.

### Count 9
### Discharging Storm Water
### In Violation of NPDES Stormwater Permits–Millers River Facility

82.     The United States realleges and incorporates by reference the allegations of
paragraphs 1 through 83 above as though fully set forth herein.

83.     On June 9, 1996, BS&G received coverage under the 1995 Multi-Sector
Permit for storm water discharges from the Millers River Facility to the Millers River.
The 1995 Multi-Sector Permit contained a variety of terms and conditions designed to

ensure the implementation of practices to reduce the pollutants in storm water discharges associated with industrial activity at the facility.

84.     The 1995 Multi-Sector Permit required BS&G to develop and implement a Storm Water Pollution Prevention Plan (SWPPP) for the facility in accordance with requirements specified in the permit.  Among other things, the SWPPP had to identify potential sources of pollution which could reasonably affect the quality of the storm water discharges, and had to describe and ensure implementation of practices to decrease pollutants in storm water.  One required practice was that qualified personnel conduct monthly inspections of the facility at least once a month, that appropriate follow up actions be taken in response those inspections, and that records of the inspections be maintained.

85.     During the period beginning June 9, 1996, until at least February 2000, BS&G failed to implement its SWPPP by discharging storm water associated with industrial activity from the Millers River Facility without conducting monthly inspections, taking appropriate follow up actions in response those inspections, or maintaining records of the inspections, in violation of its permit and section 301(a) of the CWA, 33 U.S.C.

§ 1311(a).

86.     The 1995 Multi-Sector Permit required that BS&G's SWPPP provide for qualified personnel to conduct Comprehensive Site Compliance Evaluations at appropriate intervals specified in the SWPPP (but in no case less than once a year); to

prepare a report summarizing the results and actions taken as a result of the evaluation; and to retain the report as part of the SWPPP for at least three years. BS&G's SWPPP provided for Comprehensive Site Compliance Evaluations to be conducted twice a year.

87.     During the period June 9, 1996, through at least February 2000, BS&G failed to implement its SWPPP by discharging storm water associated with industrial activity from the Millers River Facility without conducting SWPPP Comprehensive Site Compliance Evaluations twice a year as specified in BS&G's SWPPP, without preparing a report summarizing the results and actions taken as a result of the evaluation, and without retaining the report as part of the SWPPP, all in violation of its permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

88.     The Multi-Sector Permit required BS&G to amend the SWPPP whenever there was a significant change in design, construction, operation, or maintenance of the facility.

89.     BS&G failed to amend its SWPPP following two significant changes in the design, construction, operation, or maintenance of the Facility that occurred between January 31, 1997, and February 7, 2000. From January 31, 1997, through February 7, 2000, BS&G therefore violated its permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a), each time it discharged storm water associated with industrial activity to the Millers River.

90.     The 1995 Multi-Sector Permit required BS&G to conduct analytical monitoring and reporting for each outfall at least quarterly during years two and four of

the Permit, specifically the period October 1, 1996, through September 30, 1997, and the

period October 1, 1998, through September 30, 1999.  The permit required BS&G to

record the monitoring results on quarterly monitoring report forms, and to submit the

forms to EPA, postmarked no later than March 31, 1998, and March 31, 2000,

respectively.

91.     During the period October 1, 1996, through September 30, 1997, and the

period October 1, 1998, through September 30, 1999, BS&G discharged storm water

associated with industrial activity from the Millers River Facility without conducting

analytical monitoring of its storm water discharges or reporting the results to EPA, in

violation of its permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

92.     The 1995 Multi-Sector Permit required BS&G to conduct visual monitoring

and reporting for each outfall at least quarterly throughout the permit period, and to

maintain the results of such monitoring on site in the SWPPP.

93.     During the period June 9, 1996, through at least February 2000,  BS&G

discharged storm water associated with industrial activity from the Millers River Facility

without conducting quarterly visual monitoring of its storm water discharges and without

maintaining the results of such monitoring on site in the SWPPP, in violation of its permit

and section 301(a) of the CWA, 33 U.S.C. § 1311(a).

94.     Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b)

and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is

liable for a civil penalty of up to $25,000 per day for each violation occurring prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

**Count 10**
**Discharging Storm Water**
**In Violation of NPDES Stormwater Permits–Everett Facility**

95.     The United States realleges and incorporates by reference the allegations of

paragraphs 1 through 96 above as though fully set forth herein.

96.     Pursuant to the Baseline General Permit, 57 Fed. Reg. 44446-47, a covered

facility was required to develop a  SWPPP for the facility meeting specific requirements

for its preparation and implementation.

97.     From October 1, 1992, through September 25, 1997, Ossipee failed to

prepare a SWPPP for the Everett facility in accordance with the requirements of the

Baseline General Permit.

98.     To the extent Ossipee's Everett Facility was covered by the Baseline

General Permit (notwithstanding the deficiencies of its NOI), by failing to prepare a

SWPPP in accordance with the requirements of the permit, Ossipee violated the terms and

conditions of the permit and section 301(a) of the CWA, 33 U.S.C. § 1311(a), each time it

discharged storm water from the Everett Facility from October 1, 1992, through

September 25, 1997.  To the extent Osippee was not covered by the Baseline General

Permit, it violated section 308(a) of the CWA, 33 U.S.C. § 1318(a), by failing to properly

apply for the permit, and violated section 301(a) of the CWA, 33 U.S.C. § 1311(a), by

discharging storm water associated with industrial activity without a permit.

99.     Pursuant to sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b)

and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Ossipee is

liable for a civil penalty of up to $25,000 per day for each violation occurring prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

### Count 11
### SPCC Plan Violations – South Boston Facility

100.     The United States realleges and incorporates by reference the allegations in

paragraphs 1 through 101 as though fully set forth herein.

101.     Pursuant to section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1), EPA has

promulgated Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

102.     The Oil Pollution Prevention Regulations require, among other things, that

the owner or operator of an onshore facility in operation on or before January 10, 1974,

(the effective date of the Oil Pollution Prevention Regulations) that has discharged or, due

to its location, could reasonably be expected to discharge, oil in harmful quantities into or

upon the navigable waters of the United States shall have prepared a Spill Prevention,

Control, and Countermeasure (SPCC) Plan by no later than July 10, 1974.  40 C.F.R. §

112.3(a).  Pursuant to 40 C.F.R. § 112.3(b), owners or operators of facilities that become

operational after January 10, 1994, shall prepare a SPCC Plan within six months after the

date the facility begins operations.

103.    The Oil Pollution Prevention Regulations require that the SPCC Plan meet

specific requirements for its preparation and implementation.  The Plan must specify the

procedures that the facility will use to prevent or contain any oil discharged from the

facility in order to prevent the oil from reaching navigable waters of the United States.  40

C.F.R. § 112.3(a).  The Plan must require the installation of appropriate containment

equipment, 40 C.F.R. § 112.7(c), and describe additional oil spill prevention measures, 40

C.F.R. § 112.7(e).  In addition, the owner or operator of the facility must maintain a

complete copy of the SPCC plan at the facility.  40 C.F.R. § 112.3(e).  No SPCC plan is

effective until it has been reviewed and certified by a professional engineer.  40 C.F.R.

§ 112.3(d).  The Oil Pollution Prevention Regulations further require that owners and

operators of facilities subject to 40 C.F.R. § 112.3(a) or (b) shall complete a review and

evaluation of the SPCC plan at least once every three years from the date such facility

becomes subject to the provision.  40 C.F.R. § 112.5(b).

104.    BS&G is the "owner" and "operator" of the South Boston Facility within

the meaning of section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6),  and 40 C.F.R.

Part 122.

105.    The South Boston Facilities is an "onshore facility" within the meaning of

section 311(a)(10) of the Clean Water Act, 33 U.S.C. § 1321(a)(10) and 40 C.F.R. Part

122.

106.    At all relevant times, BS&G has stored "oil" within the meaning of  40

C.F.R. § 112.2 at the South Boston Facility.  Due to its location, the south Boston Facility

could reasonably be expected to discharge oil in harmful quantities into or upon surface waters which are "navigable waters of the United States" within the meaning of section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. §§ 110.1 and 112.2(k).

107.   Since at least May 1996, the South Boston Facility has had an oil storage capacity subjecting it to the requirements of the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

108.   BS&G failed to prepare a certified SPCC plan for the South Boston Facility which met the requirements of 40 C.F.R. Part 112 for its preparation and implementation until at least May 1999.

109.   By failing to prepare an SPCC plan for the South Boston Facilities in accordance with the Oil Pollution Prevention Regulations, BS&G violated 40 C.F.R. § 112.3.

110.   Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), authorizes the United States to bring a civil action for penalties for the failure to prepare and implement a proper SPCC plan.  Pursuant to section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, BS&G is liable for civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

### Count 12
### SPCC Plan Violations – Everett Facility

111.   The United States realleges and incorporates by reference the allegations in paragraphs 1 through 113 as though fully set forth herein.

112.   Ossipee the "owner" and "operator" of the Everett Facility within the meaning of section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6),  and 40 C.F.R. Part 122.

113.   The Everett Facility is an "onshore facility" within the meaning of section 311(a)(10) of the Clean Water Act, 33 U.S.C. § 1321(a)(10) and 40 C.F.R. Part 122.

114.   At all relevant times, Ossipee has stored "oil" within the meaning of 40 C.F.R. § 112.2 at the Everett Facility.  Due to its location, the Everett Facility could reasonably be expected to discharge oil in harmful quantities into or upon surface waters which are "navigable waters of the United States" within the meaning of section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. §§ 110.1 and 112.2(k).

115.   Since at least January 1978, the Everett Facility has had an oil storage capacity subjecting it to the requirements of the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

116.   Ossipee failed to prepare a certified SPCC plan for the Everett Facility which met the requirements of 40 C.F.R. Part 112 for its preparation and implementation until at least May 1999.

117.   By failing to prepare an SPCC plan for the Everett Facility in accordance with the Oil Pollution Prevention Regulations, Ossipee violated 40 C.F.R. § 112.3.

- 24 -

118.    Pursuant to section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C),

and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Ossipee is liable for

civil penalty of up to $25,000 per day for each violation occurring prior to January 30,

1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

## RELIEF SOUGHT

Wherefore, Plaintiff, the United States of America, respectfully requests that the

Court grant the following relief:

1.      Permanently enjoin BS&G, Ossipee, and Southeastern from discharging

waste water or storm water from any point source not authorized by a NPDES permit or

in violation of the terms of any NPDES permit;

2.      Order BS&G, Ossipee, and Southeastern to comply with all applicable

requirements of the Clean Water Act and its implementing regulations;

3.      Permanently enjoin BS&G and Ossipee from storing oil at facilities that

could reasonably be expected to discharge oil in harmful quantities into or upon surface

waters except in compliance with the Oil Pollution Prevention Regulations at 40 C.F.R.

Part 112.

4. Order BS&G to pay a civil penalty not to exceed twenty-five thousand dollars

($25,000) for each day of each violation of the Clean Water Act occurring prior to

January 31, 1997, and not to exceed twenty-seven thousand five hundred dollars

($27,500) for each day of each violation of the Clean Water Act occurring on or after

January 31, 1997, at BS&G's Millers River and South Boston Facilities;

5.      Order Ossipee to pay a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each day of each violation of the Clean Water Act occurring prior to January 31, 1997, and not to exceed twenty-seven thousand five hundred dollars ($27,500) for each day of each violation of the Clean Water Act occurring on or after January 31, 1997, at Ossipee's Everett Facility;

6.  Order Southeastern to pay a civil penalty not to exceed twenty-five thousand dollars ($25,000) for each day of each violation of the Clean Water Act occurring prior to January 31, 1997, and not to exceed twenty-seven thousand five hundred dollars ($27,500) for each day of each violation of the Clean Water Act occurring on or after January 31, 1997, at Southeastern's Weymouth Facility;

7.      Award the United States all costs and disbursements of this action; and

8.      Grant such other relief as the Court deems just and proper.

For the United States of America,

_Tom Sansonetti_

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division


MICHAEL J. SULLIVAN
United States Attorney


By: _____

George B. Henderson, II
Assistant U.S. Attorney
John J. Moakley Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210
(617) 748-3272

OF COUNSEL:
Michael Wagner
Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Boston, MA 02114

Dated:      5/29/02

- 27 -